LISA SCOLARI
Attorney at Law
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007
scolarilaw@gmail.com
(212) 227-8899

March 6, 2026

Hon. John P. Cronan
United States District Court
500 Pearl Street New
York, NY 10007
*via ECF*

**Re: United States v. Wilianyi Almanzar Polanco**
23 Cr 501 (JPC)

Your Honor:

We write to request a pre-sentence conference to address the potential representation issue that arose after Mr. Almanzar' Polanco's bond hearing on January 5, 2026 due to the Court's statements at the hearing. We respectfully refer the Court to the following portion of the hearing transcript. (Exhibit A)

THE COURT: Well, Ms. Scolari wrote[1]: Beginning on Thanksgiving weekend – which would have been Saturday 29, and continuing, which, presumably, would be at least the date of her letter on December 19 – she wrote that one unit was locked down for at least three full weeks. That's just wrong.

MS. NEWMAN: Well, I -- I only --

THE COURT: I don't know how else to say it, but I didn't just rely on the government either. I spoke with the MDC and got information directly from the captain of the jail, and what Ms. Scolari wrote in that letter wrong. There's no two ways about it; it's wrong.

MS. NEWMAN: I understand…..

THE COURT: Well, you wrote it to me –well, no you, but she [referring to Ms. Scolari] did --- in a filing with the Court as an officer of the Court without looking onto the facts. You must understand my frustration here, Ms. Newman, because
I rely on defense counsel to give me accurate facts.
*Id.* at 10-11.

.

---

[1] Referencing Ms. Scolari's letter dated December 19, 2025 Dkt # 204:

Although Ms. Newman explained the basis for counsel's factual claims (see *Id* at 11-14), nonetheless, we believe that Mr. Almanzar Polanco was left with the impression that this Court has reservation regarding counsels' veracity. This doubt could also impact the Court's view of counsels' sentencing arguments on behalf of Mr. Almanzar Polanco. Accordingly, we respectfully request the Court schedule a pre-sentence conference to allay any concerns that this Court and Mr. Almanza Polanco may have regarding counsel's veracity and effectiveness.

Respectfully,

*Lisa Scolari*

**Lisa Scolari and**
Donna Newman
Counsel for Wilianyi Almanzar Polanco

The request is granted.  The parties shall appear for a status conference on March 26, 2026, at 10:00 a.m.  The Clerk of Court is respectfully directed to close Docket Numbers 247 and 248.

SO ORDERED.
March 6, 2026
New York, New York

JOHN P. CRONAN
United States District Judge

Q15FPoLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

　　　　　v.　　　　　　　　　　　23 Cr. 501 (JPC)

WILIANYI ALMANZAR POLANCO,

　　　　　　　　　　　　　　　　　Conference
　　　　　　　　Defendant.

------------------------------x

　　　　　　　　　　　　　　　　　New York, N.Y.
　　　　　　　　　　　　　　　　　January 5, 2026
　　　　　　　　　　　　　　　　　11:00 a.m.


Before:

　　　　　　　　　　HON. JOHN P. CRONAN,

　　　　　　　　　　　　　　　　　District Judge

　　　　　　　　　　　APPEARANCES

JAY CLAYTON
　　　United States Attorney for the
　　　Southern District of New York
BY:　MARGARET LYNAUGH
　　　ADAM SOWLATI
　　　Assistant United States Attorneys

DONNA R. NEWMAN
　　　Attorney for Defendant

Also Present:

Gabriel Mitre, Interpreter (Spanish)

THE INTERPRETER:  Tray.

THE DEPUTY CLERK:  Your Honor, we are here in the matter of *United States v. Almanzar Polanco*, Case No. 23 Cr. 501.

Can counsel, starting with the government, please state your appearance for the record.

MS. LYNAUGH:  Good morning, your Honor.

Margaret Lynaugh and Adam Sowlati for the government.

THE COURT:  Good morning, Ms. Lynaugh and Ms. Sowlati.

MS. NEWMAN:  Good morning, your Honor.

Donna Newman on behalf of Wilianyi Almanzar Polanco, who is standing next to me.

Thank you, your Honor.

THE COURT:  Good morning, Ms. Newman and Mr. Almanzar Polanco.  I apologize for starting a few minutes late.  I was on a call that went longer than expected.

We're joined this morning by a Spanish-language interpreter.  I'll ask him to please identify himself for the record.

THE INTERPRETER:  Gabriel Mitre, staff interpreter for the Court, your Honor.

THE COURT:  Good morning, Mr. Mitre.

Mr. Almanzar Polanco, if at any point you have difficulty understanding the interpreter or the interpretation, please let me know, and we'll address any

issues.

We're here today after Mr. Almanzar Polanco pled guilty before me to the lesser-included offense of Count Two of the S8 superseding indictment that was pursuant to a plea agreement with the government.

At the conclusion of the plea hearing, I asked for the parties' views as to whether Mr. Almanzar Polanco should be remanded, and then later, I received views that the parties were not in agreement and they made their submissions as to that issue. The defense submission came in on December 19 and the government's on December 23.

I reviewed both submissions in advance of today's hearing, so I want to hear arguments from the parties as to whether, in light of Mr. Almanzar Polanco's guilty plea, he should be remanded pending sentencing.

I'll start, I guess, with Ms. Lynaugh, if there's anything you wish to add to your letter.

MS. LYNAUGH: I don't think there's anything in particular we need to add to the letter. I'll just emphasize, your Honor, that we don't think exceptional reasons are present here. Remand is mandatory at this time.

The defendant Has cited to his criminal history or his lack of criminal history as an exceptional circumstance. We don't think that qualifies. And in particular, his role in this particular offense in this case was sufficiently serious

that we think that remand is important at this time.

With respect to the defendant's family circumstances, although it is unfortunate that defendant would be separated from his child, he is facing a mandatory minimum sentence of five years of imprisonment, so there will at some point be a separation and we don't think these family circumstances are the kind of unique circumstances that amount to exceptional circumstances.

With respect to conditions --

THE COURT:  I'm sorry.  Just a moment.  And this, I think, was very clearly implied by what you just said.  I assume the government will, in fact, be requesting a term of incarceration due to the mandatory minimum.

MS. LYNAUGH:  Yes, your Honor.

He -- obviously, we would request at least the mandatory minimum term of five years' imprisonment.  We haven't determined yet what term of imprisonment we would be seeking.

THE COURT:  And in terms of the seriousness of the offense, one of the arguments that the defense makes is -- or, at least, relies on the fact that Mr. Almanzar Polanco received a minor role adjustment in the plea agreement.

What, if anything, should I read from that?

MS. LYNAUGH:  So, he received a minor role.  He did not receive a minimal participant role.  The minor role reduction, if you read the commentary to the guidelines, is

appropriate when a defendant is less culpable than many of the other people that he is being prosecuted with.

So, in this case, the government does recognize that he is not a leader of this group. He is less culpable than many of his codefendants. However, that does not mean that his role was minimal, does not mean that it was insignificant; it does not mean that it was not dangerous to the community and did not carry with it great consequences.

Just as an example, the stash house with which the defendant was associated, when the law enforcement agent searched it, contained 83,000 counterfeit prescription pills and 2,000, approximately, priority mail envelopes for shipping. That is an enormous quantity of drugs that was going to be shipped to victims cross the country and had the potential to injure, or worse, any one of them. So, we think that this is a very significant offense even though his role in it was less culpable than some of the other people involved.

To put that in perspective, some of the other people involved in this case are charged with being involved in a continuing criminal enterprise, so the relative culpabilities here doesn't mean that he is someone we view as an insignificant player in the drug offenses.

THE COURT: And again, his role was, essentially, a shipper at the Wadsworth pill mill and was involved in packaging and shipping the pills. Is that the government's

Q15FPoLC

view?

MS. LYNAUGH:  He was a shipper associated with a particular stash house.

THE COURT:  Stash house, right.

MS. LYNAUGH:  It was a stash house.

And so I think what we've cited in our letter is, GPS data puts him at that stash house approximately ten times in the months leading up to his arrest, and then data on his cell phones also indicates his involvement with drugs going back at least as early as, I believe it was August of 2024 -- sorry, August of 2023.

THE COURT:  And when he was arrested, he had a large number of packages.

MS. LYNAUGH:  When he was arrested, he and another individual were attempting to ship 35 packages containing over 4,000 fake prescription pills.

THE COURT:  Does role in the offense even matter in terms of exceptional circumstances?  In other words, exceptional circumstances, does that extend to the role of the offense or is it just other factors?

MS. LYNAUGH:  So, I think exceptional circumstances, your Honor, is a matter that is very much within the Court's discretion.  So, we addressed role in the offense because the defense counsel had raised it.  I think normally, if you are looking at it in a very narrow scope, you could say:  What are

the circumstances in this person's life that are exceptional that that require them to be out.  I do think that is role in the offense probably plays some part in it.

And certainly, your Honor, there's also the requirement that the defendant satisfy the conditions for release under 3143(a)(1) which state that he not be a danger to the community or risk of flight.  So I think the role of offense comes in in that sense, as well.

THE COURT:  Okay.

I think you were turning to conditions.

MS. LYNAUGH:  Conditions.  So, I think what defense counsel -- as I understand it, just based on our discussions before this proceeding -- what defense counsel primarily intends to argue are the conditions at the MDC.  Your Honor has issued, or at least commented twice on the conditions at the MDC and that they are improving.  Our understanding is that staffing levels have significantly increased at the MDC over the past year, year and a half.

MDC released a factsheet in September of 2025, saying that their staffing levels are at 87 percent, which is very much up from what it had been in the past.

My understanding is that defense counsel takes issue with what the conditions at the MDC might be like now in particular, given the arrival of defendant Maduro over the weekend and whether that will impact the conditions for

inmates, generally, there.

With respect to that, your Honor, we've reached out to MDC legal. I think, this is Day 1, and I don't think anyone has a very clear picture of how things will be in a steady state, so I don't want to make representations to the Court about how those conditions will change or not change at the moment, based on Mr. Maduro's arrival at the MDC.

And then I'll just address, very briefly, the defense's reply letter about conditions that they had raised in their initial submission and that the government had responded to.

Your Honor, we can't speak to -- obviously, we don't have personal knowledge about what happens at the MDC on any given day. We had reached out to MDC legal about the specific instances that were raised. The general impression that we got from MDC legal is there haven't really been institution-wide lockdowns since November; there have been periods of modified operations --

THE COURT: Which ask not a lockdown.

MS. LYNAUGH: Which is not a lockdown. As I understand it, modified operations means that the inmates on a particular unit are released from their cells for three hours a day, one floor at a time, and that's in order for MDC personnel to diffuse any dangerous situations and to make sure that after something like an incident or assault that things are operating

properly and there's no continued tensions that need to be addressed on a wider scale.

So there have been some limited periods of those modified operations with respect to specific units, but there haven't been the kind of broad institution-wide lockdowns with prohibited legal visits that have been the cause for concern in the past as I understand it.

And unless you have any further questions, your Honor, I'll take a seat.

THE COURT:  I don't believe so.

I'll hear from Ms. Newman.

MS. NEWMAN:  Thank you very much, your Honor.

We still believe that there are exceptional circumstances.  I don't hear the government arguing that he's a danger to the community or a risk of flight, and so the issue, as I see it, is simply exceptional circumstances.

And the government agrees that this is a flexible standard in the statute in which it's really a case-by-case determination.

So, we disagree about MDC.  To be allowed -- they, the MDC, calls it a modified lockdown or modified conditions, but being allowed out of the cell just three hours a day is a problem, because they are still not allowed to shower.  They're still not allowed to go on -- or go to CorrLinks if they can get to it the same way with any of their discovery.

Q15FPoLC

Now, I understand he's pled guilty and that puts him in different circumstances as the ability to look at discovery. Nonetheless, as the Court is well aware, sentencing is an extremely important proceeding.  And we will be communicating with the defendant, obviously, as we should, and developing -- as we have been -- what we will be saying in your sentencing memo, which really must and might have to do with some of the discovery.  I just lay that out there because it's not like, well, he won't need to get to the discovery.

And I understand the distinction, but I do think the Court should be aware of that.  But on the other hand, we're at MDC -- we, being the defense counsel -- are there every day.  I have one client that I have paralegal seeing at least three to four times a week, and I'm there at least once to twice a week and have been for over a year because of this one client as well as seeing my other clients.

They tell us a different story.  Now, it's not from one client that you might say they exaggerated.  This is from multiple clients, from multiple defense counsel, from multiple units.  Now, I understand that they're not having, on a regular basis, you know, the entire unit, the entire MDC lockdown for -- as it was, and the Court was aware -- months weeks on end.

THE COURT:  Well, Ms. Scolari wrote:  Beginning on Thanksgiving weekend -- which would have been Saturday, November 29, and continuing, which, presumably, would be at

Q15FPoLC

least the date of her letter on December 19 -- she wrote that one unit was locked down for at least three full weeks. That's just wrong.

MS. NEWMAN: Well, I -- I only --

THE COURT: I don't know how else to say it, but I didn't just rely on the government either. I spoke with the MDC and got information directly from the captain of the jail, and what Ms. Scolari wrote in that letter wrong. There's no two ways about it; it's wrong.

MS. NEWMAN: I understand.

THE COURT: Well, you wrote it to me -- well, not you, but she did -- in a filing with the Court as an officer of the Court without looking into the facts.

You must understand my frustration here, Ms. Newman, because I rely on defense counsel to give me accurate facts.

MS. NEWMAN: So, let us tell you where we got our information.

By the way, while you can get ahold of MDC and speak to certain officials, we very rarely will be able to communicate. I can never say never, but I will tell you very rarely I have had that occasion where things are not lockdown-related, let's say, medical-related where it was important for me to communicate, and I -- taken me weeks on end. So it's not just, I want to now about life; this is really important medical reasons.

Q15FPoLC

But we got it from several different inmates who were in that unit. Now, the Court can say: You know, defense counsel, you should know that inmates have a tendency to exaggerate and not specify if it's truth, and so you should be more exact in your communication.

I did communicate. I did ask at least three to four inmates when -- around the time we were writing this letter, and I had gotten this information not because of the letter, just by conversation with them. So it wasn't: I'm going to ask you about lockdowns, let me know; it was more, we've been locked down. And that was the information I had.

Now, I understand the Court's frustration, your Honor. I was a law clerk. I get it, what we have to rely on and whether or not -- and I'm telling you our frustration in trying to get to the Court the reliable information. I hear about these lockdowns on a regular basis. Now are they three hours? Are they all day? Does it go to the next unit that's next to them? Well, I don't have a client maybe in the adjacent unit, but this is the information we have.

All I'm saying and what the government agrees -- and I ask the Court to forgive us for relying on inmates, but that's the information we have.

Now -- but when the government is saying is just modified. Nonetheless, it's a lockdown.

So I have other clients by the way -- we've said this

in another case in Court who, because he wasn't part of a gang, a timid -- as a matter of fact, he was a timid client, so I want to say he stood out as somebody who was easily frightened and had a somewhat lower intelligence, so he's obviously somebody who would be more vulnerable -- he felt he could not take a shower alone and had several people stand with him. Now, is everybody as vulnerable? I don't know. But that was a concern.

In addition, it's not that the government is saying these assaults that our clients reported to us didn't happen. Indeed, in one case, on the record, the government advised: While it may appear to the inmates that the guard is just standing watching the assault, after all, it would be a jeopardy for the guard to intervene and therefore not unless backup arrived. Well, that may well be a genuine and credible statement. But nonetheless, the assault happened and the guard stood by. We may understand why, but it happens.

Weapons might -- my clients tell me they see it all the time. I am not saying this is COVID-like lockdown. I want to make that clear to the Court.

So when we say things have improved, yes, they have improved. But have they improved to a situation where this client -- and so, when we go case by case and the flexibility that this Court can have, we believe that this -- that he, personally, will have some danger.

Now, that is our concern. So, when we talk about flexible standard, that's what we're talking about.

And I am not -- again, so that the Court understands, my credibility, I would never state something that I didn't believe or based on information I get from my various clients and other defense counsel.

The Court well may say: Look, I spoke to somebody at the separation, and that's not what they're reporting. I don't know why there is such a discrepancy, only to say that I was involved in another case in the Eastern District about two years ago. There was a hearing. I was not the defense counsel; I was cocounsel and I had another defendant but present during some of the testimony where the Court found that the MDC legal staff had lied about various things that were issues in that case.

Now, I'm not saying that whom the Court spoke to or the government spoke to lied. I don't know who it is. I wouldn't make that assumption. I wouldn't be here, and I wouldn't get the Court's credibility. I'm only saying that is part of our argument.

There are personal circumstances here, likewise, that the Court can consider. The issue is, are there beyond that, because that's what the case law says. And so that's our position, and I don't think that the government can say that every inmate in MDC is safe. They are not. Gangs control.

They do, your Honor, with respect to other jails likewise. It's not a good situation. MDC is not alone in that.

So, that's my position. I think we try very hard to present the Court with an alternative position in support of our claim that our client, that this client, who is not a risk or danger, should remain on bond until sentencing.

THE COURT: So the standard, though, is exceptional circumstances. And I know part of your argument entails the situation at the MDC, but what other exceptional circumstances are you pointing to here.

As Ms. Lynaugh mentioned -- or, I think she mentioned -- impact on family is a regrettable but unavoidable reality of a criminal conviction.

MS. NEWMAN: Right, yes; and it is. And the Courts always say that at sentencing when there has to be a lengthy sentencing, the impasse of their child. Understandably, that's true; there's nothing to argue about that.

But we're also saying, your Honor, that like other inmates -- not all -- that because he's going to be removed, that every minute he has with his child is precious. I was remiss in not pointing out in the courtroom -- I'm sorry -- is his wife his mother and, I believe, his cousin, so he has the family support, which has been there always.

So the -- it's personal -- my understanding of the way the courts have resolved this issue is personal plus. Are

Q15FPoLC

there exceptional circumstances then if we boil it down?  Is this particular inmate -- being who he is, with no gang affiliations -- would have a more difficult time in MDC regardless if it's better is not great; right?  Better doesn't equal great and equals problems for inmates and about that he will be removed.

I think what boils down to a very simple argument.  I hope that if the Court has any questions, I'll be glad to address it.

THE COURT:  I think you've already addressed most, if not all of my questions.

You know, essentially, what I wanted to hear from you from is why the circumstances here are exceptional.  They courts seem to have been clear that complying with pretrial release or going to school or having a job or either family obligations just don't rise to the level of exceptional, so I wanted to make sure I understood your argument here.

Okay.  If you just me a minute to gather my thoughts, I'll come back.

MS. NEWMAN:  Sure.  Thank you, your Honor.

(Recess)

THE COURT:  I'm going to issue my ruling on the request for Mr. Almanzar Polanco's remand pending sentencing.

Title 18 U.S.C. § 3143(a)(2) provides that a judge must order a person found guilty of certain offenses to be

detained pending sentencing. Those offenses include crimes mentioned at Title 18 U.S.C. § 3142(f)(1)(C) which, in turn, include an offense for which the maximum term of imprisonment is ten years or more under the Controlled Substances Act. The offense to which Mr. Almanzar Polanco pled guilty to committing is one that falls under that provision.

There are two limits exceptions contained in § 3143(a)(2) itself, and neither applies. In addition to finding by clear and convincing evidence that the defendant is not likely to flee or pose a danger to any other person or the community, either one of two conditions must be met. First, if the judicial officer finds there is a substantial likelihood that a motion of acquittal will be granted. Now, that condition does not apply here, given that I found Mr. Almanzar Polanco knowingly and voluntarily pled guilty; and second, if the prosecutor has recommended no sentence of imprisonment be imposed, and that exemption also does not apply, as Ms. Lynaugh represented that the government expects to recommend a sentence of imprisonment. That is not surprising, given the five-year mandatory minimum sentence for this offense. The question then becomes whether there are exceptional circumstances under section 3145(c), and that is what Mr. Almanzar Polanco is arguing here.

The last sentence of U.S.C. § 3145(c) provides that a person subject to detention pursuant to § 3143(a)(2) or (b)(2)

and who meets the conditions of release set forth in § 3143(a)(1) or (b)(1) may be ordered released under appropriate conditions by the judicial officer if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate. So the question there before it is whether the circumstances here present exceptional reasons for why Mr. Almanzar Polanco's detention leading to sentencing would not be appropriate.

Exceptional circumstances exist where there is a unique combination of circumstances giving rise to situations that are out of the ordinary. Determining whether exceptional circumstances exist, necessarily, is a case-by-case evaluation, but the circumstances do, indeed, need to be exceptional. They cannot be merely compliance with conditions of release or holding a job or going to school, or even typical family responsibilities, all of which are inevitably impacted by a conviction that results in a period of incarceration.

The second Circuit, for instance found clear error in *United States v. Lea* 360 F.3d 401 (2d. Cir. 2004,) after the district court found exceptional circumstances for someone who had complied with bail, was enrolled in college, was employed full-time, and had no prior convictions. Mr. Almanzar Polanco argues that he presents exceptional circumstances because he had been compliant with the conditions of his pretrial release, he has close family ties and provides a majority of

Q15FPoLC

the financial support for his family.  He has particularly close ties with his son, who Mr. Almanzar Polanco may not see after his term of imprisonment, given his possible removal to the Dominican Republic.

His conduct in this offense was aberrational.  He played a minor role in the conspiracy, and the conditions at Metropolitan Detention Center are, "awful and dangerous."  I will address those arguments.

While I commend Mr. Almanzar Polanco for his behavior while released on bail, compliance with the terms of his release does not rise to the level of exceptional circumstances.  Had Mr. Almanzar Polanco not complied with the conditions of his release, he very well may have been remanded. Nor does the fact that Mr. Almanzar Polanco have no prior criminal record rise to the level of exceptional circumstances. Las the Second Circuit noted in *Lea*, as and as I quoted earlier, there is nothing exceptional about going to school, being employed, or being a first-time offender, separately or in combination.  And similarly, Mr. Almanzar Polanco's family obligations and his very understandable entire to spend time with his son before he is incarcerated as well as his concern of his eventual removal or deportation do not amount to exceptional circumstances.

The sad reality is that incarceration causes real harm to innocent family members and, regrettably, leads to hardships

suffered by not just the defendant, but his or her family. And it is commonly the situation where a primary breadwinner for the family faces incarceration. Judge Sweet noted in *United States v. Lippold*, 175 F. Supp. 2d 537 (S.D.N.Y. 2001) that, "circumstances that are purely personal do not typically rise to the level of exceptional, warranting release pending sentencing pursuant to 3145(c)."

In that case, for example, the defendant was the father of three young children whom he supported financially and a seven-month-old son with recently diagnosed with Bell's palsy. Furthermore, the defendant's employer submitted a letter requesting that the defendant be released in order to train his replacement. Judge Sweet found that these circumstances do not rise to the level of exceptional circumstances to justify release pending sentencing after applying the language of § 3145(c). Judge Sweet's reason, that also, the need to follow Congress' mandate regrettably results in separating him from his family and his work, such is the case with every defendant facing a custodial sentence.

And again, while I commend that Mr. Almanzar Polanco appears to have a family and, in particular, with his son, that does not give rise to exceptional circumstances. Rather, these circumstances are purely personal.

As Judge Spatt noted in *United States v. Schlesinger*, 2005 WL 1657043 (E.D.N.Y. June 8, 2005), such personal

circumstances are more akin to the common collateral damage of imprisonment that many defendants encounter.

I also do not find that current conditions at the Metropolitan Detention Center constitute exceptional circumstances. The defense cites Judge Furman's decision in *Chavez*. Regardless of whether I agree with that analysis, that decision is now over two years old. The government points to more recent comments I have made regarding conditions at the MDC. Those are at sentencing, *United States v. McCollum* and United States v. Caraza-Pinez, and the sentiments I expressed in those cases largely hold true today.

The MDC now has higher staffing levels. Lockdowns are occurring with much less frequency, and the overall conditions of the MDC have improved. Now, to be clear, the MDC is, of course, a jail. Modified operations and even lockdowns are inevitable. The parties dispute whether the entire facility was shut down for all or some of December 10 and whether units were locked down or on modified operations after Thanksgiving as well as the length of any restrictions, but in the end, that dispute does not matter.

As I just said, lockdowns and modified operations will occur at a jail. Inmate violence, unfortunately, will occur. The conditions at the MDC are not perfect, but I find no basis to conclude that the current conditions at the MDC are so exceptional to warrant relief from the mandatory detention

Q15FPoLC

language that Congress has enacted to § 3143(a)(2).

The defense also points to Mr. Almanzar Polanco's role in the offense. First, it is not entirely clear to me that the defendant's role would be relevant to the exceptional circumstances analysis. The statute is clear that when a defendant is convicted of certain offenses, including the one which Mr. Almanzar Polanco pled guilty, remand is mandatory, absent extraordinary or exceptional circumstances. There is no carve-out for defendants who have played a reduced role in that offense. But in any event, even in assuming that it would be proper for me to consider the defendant's role, I do not find that role to constitute exceptional circumstances.

While the parties may have stipulated to minor role reductions for Mr. Almanzar Polanco, in the plea agreement, I make a couple of observations about that. First of all, that stipulation is not binding on me. But more importantly, based on the government's proffer of Mr. Almanzar Polanco's role, he did play an important role in this drug distribution conspiracy.

So it was a conspiracy that resulted in at least one death. His role was a shipper, working with others to ship pills to customers who were really victims, across the United States. He worked at a stash house on Wadsworth Avenue in Washington Heights.

When you have a massive drug conspiracy like this

Q15FPoLC

one, many individuals must play different roles for the scheme to succeed.  If not for those who ship the pills, the illegal drug distribution business like this one would not be able to operate.  And in fact, the circumstances of Mr. Almanzar Polanco's arrest make that plain.  He and another defendant were arrested in a Manhattan post office that they were attempting to mail over 35 packages of more than 4,000 fake prescription pills, and the Wadsworth stash house had about 83.000 counterfeit prescription pills, along with massive amounts of other drugs.

For those reasons, Mr. Almanzar Polanco's conditions of release are revoked, and I order that he be remanded to the custody of the U.S. Marshals Service.  I will sign an order for Mr. Almanzar Polanco's remand to the custody of the United States Marshals.  And I know the marshals are in the courtroom today, so I'll ask them to take Mr. Almanzar Polanco into custody.

Are there any other matters we should take up this morning?  Anything further from the government?

MS. LYNAUGH:  Nothing further, your Honor.

MS. NEWMAN:  Nothing further from the defense.

Thank you, your Honor, for your thoughtful decision.

THE COURT:  Please be well, and have a good rest of your day.

(Adjourned)